IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD A. BARSCH<br><br>　　　　Plaintiff,<br>　v.<br><br>MICHAEL O'TOOLE, et al.,<br><br>　　　　Defendants.<br>_____/ | No. C 07-00615 SI<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING FURTHER BRIEFING ON DUE PROCESS CLAIM; and VACATING CASE MANAGEMENT CONFERENCE** |

On October 12, 2007, the Court held a hearing on defendants' motion for summary judgment. Plaintiff did not file an opposition to the motion, and plaintiff did not appear at the hearing. After consideration of defendants' motion and evidence, the Court hereby GRANTS IN PART defendants' motion.[1] As set forth in Section III of this Order, the parties are directed to file supplemental briefs regarding plaintiff's due process claim. **The Case Management Conference scheduled for November 2, 2007 is VACATED and will be rescheduled as needed after supplemental briefing is received**.

**BACKGROUND**

Pro se plaintiff Edward Barsch is the father of Jean and Wayne Barsch. On January 31, 2006, Jean contacted the Hayward Police Department (HPD) and told the police that her brother, Wayne, had threatened to kill her. Complaint ¶ 19; *see also* Luevano Decl. Ex. A (Hayward Police Department reports).[2] A statement signed by Jean Barsch for the Hayward Police Department states,

---

[1] The parties filed a joint case management statement on October 24, 2007. Plaintiff makes no mention of defendants' summary judgment motion in that statement, nor does he provide any explanation as to why he did not oppose the motion or attend the hearing.

[2] Plaintiff attached portions of the police reports to the Complaint. Defendants have submitted a complete copy of the police reports as Exhibit A to the Declaration of Jean Luevano, originally filed in support of defendants' motion to dismiss.

> I have been storing my brother, Wayne's guns since about 1997. Wayne was 5150'd and the guns were confiscated from him. Wayne has been calling me over the years, harassing me about wanting the guns back. I finally got tired of Wayne calling me and threatening me over the guns so on Sunday, 01-29-2006, I took all of the guns to my dad's house in Hayward. I did not want to deal with Wayne anymore.
>
> In the past, Wayne has made threats to slice an apple on my mother's throat with the Samurai sword that I had in storage. Wayne wanted to prove that he is a true Ninja. I knew I would never give him the sword because I did not feel it was safe to do so. The sword is actually my father's property. Wayne thinks my father gave it to him, but he never did.
>
> Today, at about 0900 hours, Wayne started calling me and telling me the guns had better be at my dad's house. I called my dad and warned him that Wayne was probably on his way to his house for the guns. I was right and when Wayne got to dad's house he realized I did not bring the Samurai sword. Wayne flipped out and kept leaving messages to kill me on my voicemail at home. Wayne told me I had an hour to get the sword to him "or he would use it on me." Wayne said he was going to put the sword through my heart and kill me if I did not get him the sword. Wayne actually gave me a deadline of midnight or he would come and kill me. I am afraid that Wayne will kill me and am in great fear of him. Wayne is crazy and out of control. I know Wayne has the means to kill me because he is obsessed with guns and knives. I am sure he probably has other weapons.

Luevano Decl. Ex. A at 000018.

A statement signed by plaintiff for the Hayward Police Department states,

> I have a son named Wayne. Wayne has been diagnosed with bi-polar disorder for about 10 years and hardly ever takes his medication. Wayne currently lives in Novato. About 8 years ago in Novato, Wayne got in some sort of trouble with the Novato Police. The police asked that I take Wayne's gun[s] and keep them with me. At the time, Wayne had about 26 guns that I kept at my house for him. I realized it would be more convenient to have my daughter, Jean, keep the guns at her house so we transferred them to her house in San Francisco. Over time, Wayne had tried to get his guns back from us. Two days ago, Jean brought the guns and other weapons back to my house. The weapons include rifles, cross-bows and knives.
>
> On 01-31-2006 at about 1230 hours, my son Wayne Barsch, came to my house out of the blue. At first Wayne was acting "ok" and I did not notice anything was wrong. Wayne then noticed that I had the guns back in my house. Wayne got all excited and began cleaning and messing around with the guns. The guns were not loaded and I have hidden the ammunition for two of [the] guns in my house. There is a loaded 40 caliber handgun in my house that I have hidden. Wayne began looking for that gun and was searching for the ammunition for the Carbine short rifle. The ammunition is in the house, but it is not with the gun.
>
> Wayne then noticed a Samurai sword that I own was not there. The sword is mine, but Wayne claims it was his. I told Way[ne] that the sword was still with Jean. Wayne said, "if I [do] not have the sword by midnight, I will kill Jean." Wayne[] then pulled a 10["] fixed blade knife from the front of his waistband. Wayne got in my face. I would say we were within a couple of inches from each other. Wayne was flipping out about the Samurai sword. Wayne continually threatened to kill Jean, and I believe he would. I told Wayne he could not have the Samurai sword until I died. Wayne was holding the knife in a threatening manner, in proximity to me and said, "you might die today." That

> is the first time Wayne has ever threatened me. The sad thing is, I believe he would kill Jean. As far as his threat to me, I really do not know what to expect. He needs help. Wayne then became fixated on finding the ammunition for the guns. As he began to tear the house apart, I left. I got into my car and drove to HPD to report Wayne's actions.
>
> I know if Wayne see[s] a police uniform and he has ammunition for the gun, he would try to take out as many cops as he could. The past couple of days, Wayne has been saying that he wants to kill someone. Wayne has been stressing the need to kill someone. I am worried he may find the ammunition.

*Id*. at 000019-20.

Officer S. Mitchell from the Hayward Police Department listened to numerous threatening voice messages left by Wayne for Jean on Jean's voice mail. *Id*. at 000005-6. Based upon the voice messages as well as the statements provided by Jean and plaintiff, Officer Mitchell determined that there was probable cause to arrest Wayne for making criminal threats. *Id*. at 000010. An Incident Report prepared by Officer Mitchell states that due to the mention of multiple guns, the Hayward Police Department formed a tactical team to surveil plaintiff's house. Officers saw a man fitting Wayne's description walk out of the house, and they detained him pending identification. The report states that while Wayne was detained,

> Wayne spontaneously told the tactical team that he has [sic] called a prostitute in Emeryville last night and met her in a hotel next to Best Buy. Wayne said he found out the girl was only 15 years old, so he told her to leave. Wayne said he was then confronted by the prostitute's pimp who Wayne said he stabbed. Wayne claimed to steal the pimp's cell phone. Wayne said he then cut the phone line in his hotel room.
>
> Officer Divinagracia called Emeryville PD and asked if they had any stabbings last night. Emeryville stated there were no such reports. Officer Divinagracia was told there was an Extended Stay motel near the Best Buy but it was actually in Oakland's jurisdiction. Officer Divinagracia called Oakland Police and asked if they had any reports of a stabbing last night. Oakland said no. Officer Divinagracia then called Extended Stay and spoke to the manager, David Flowers. Flowers said there were no disturbances at the hotel last night and there was no record of a Wayne Barsch being a guest at their hotel. They also did not notice any cut phone line.
>
> Due to the fact that Edward had given us permission to go into his house, the mention of multiple guns, and Wayne's comments about stabbing someone[,] the tactical team searched the Buchanan address for possible victims and or more suspects. When they walked in, they saw multiple weapons on the floor just inside of the front door.

*Id*. at 000010-11. HPD officers collected a total of fourteen handguns, seventeen rifles (including several defined as assault weapons under California law), ammunition, and three knives, two of which were observed in plain view in Wayne's automobile. *Id*. at 000011-12.

Wayne was criminally prosecuted for possession of assault weapons, criminal threats, violation

3

of a court order, and being a convicted felon in possession of a firearm. *See* May 4, 2007 Hom Decl. Ex. B at 000063-73.[3] Following his conviction,[4] the seized weapons were sold or destroyed pursuant to court orders issued by the Alameda Superior Court. *Id*. at 000074-85. The complaint alleges that at the time of the sale, the "estimated value" of the weapons collection was more than $30,000, but that "proceeds from the police sale as returned to Wayne Barsch was $4714." Complaint at 6:30-31. In the criminal case against Wayne, it appears that plaintiff filed, and subsequently withdrew, a demand for restitution from Wayne. *See* Hom Decl. Ex. B (May 22, 2006 transcript at 000067-68).

Plaintiff filed this lawsuit on January 30, 2007, alleging claims under 42 U.S.C. § 1983 for violations of the First, Second, Fourth, and Fifth Amendments of the United States Constitution, and various claims under California law.[5] Plaintiff has sued eleven Hayward Police Department officers, the Hayward City Attorney, the Alameda County District Attorney, and the Alameda County Assistant District Attorney. Under his Fourth Amendment claim, plaintiff challenges the warrantless search of his residence, alleging that he never gave police permission to enter his home (contrary to the statement in the Hayward Police Department Incident Report)[6], and also that "[i]f indeed there was a dead whore or pimp in plaintiff's house then there is no time exigency and the police would have had sufficient time to get a legitimate search warrant and act legally." *Id*. at 9:24-26. Plaintiff also alleges that when the police officers were in his home confiscating weapons, he requested an inventory of the seized property,

---

[3] The Court previously granted defendants' request for judicial notice of (1) the certified copy of the complete criminal court file in *The People of the State of California v. Wayne Richard Barsch*, Alameda County Superior Court Case No. H-40751/Case No. 390723; (2) plaintiffs' claim presented to the City on February 14, 2006, and plaintiff's amended claim dated February 21, 2006; and (3) the City's Notice of Rejection of the claim.

[4] Wayne Barsch pled guilty to lesser related offenses, and was sentenced on May 22, 2006. *See* Hom Decl. Ex. B (May 22, 2006 sentencing transcript and April 24, 2006 plea transcript).

[5] By order filed June 21, 2007, the Court found that plaintiff's state law claims were untimely. Accordingly, the Court does not address defendants' summary judgment arguments regarding the state law claims.

[6] Plaintiff alleges that in addition to falsely stating that plaintiff gave officers permission to enter his residence, the Hayward Police Department Incident Report falsely states (1) that the confiscated weapons belong to Wayne Barsch, when in fact the weapons belonged to both Wayne and plaintiff; and (2) that Wayne Barsch was a convicted felon "in possession" of a weapon, while "at no time before, during or after being taken into custody was Wayne Barsch observed in possession of a firearm." Complaint at 6:3-8; Hom Decl. Ex. C at 000123-24.

4

and that officers refused his request. *Id*. at 5:28-29.

Plaintiff alleges that his First Amendment right to petition the government for redress of grievances was violated when the Hayward Police Department and the Hayward City Attorney's Office did not fairly and impartially investigate a complaint that plaintiff filed regarding the Hayward Police Department. Plaintiff alleges that defendant O'Toole (the Hayward City Attorney) did not conduct a fair investigation because O'Toole never contacted plaintiff about the complaint and "ignor[ed] plaintiff's side of the incident." Complaint at 8:7-8.[7] Plaintiff also alleges that his Fifth Amendment rights were violated because he has been "unlawfully deprived of his property that was illegally removed from plaintiff's residence." *Id*. at 11:13-14. The Complaint alleges that "Court order H40751 dated 5/22/06 caused plaintiff's property to be sold and the proceeds given to Wayne Barsch. This was done in spite of plaintiff's written objection that such action was illegal." *Id*. at 11:14-17.

Plaintiff seeks "full monetary reimbursement for all property removed from plaintiff's home on January 31, 2006," with the "valuation to be based on values as set forth in a recognized firearms catalog." Complaint Prayer for Relief ¶ 1. Plaintiff also seeks "[f]ull monetary reimbursement for what it would cost to rent all the property taken from plaintiff's home for the period of time from January 31, 2006 to date of conclusion of this case," punitive damages, and "other and further relief as the Court deem[s] just and proper." *Id*. ¶¶ 2, 4, 5. Now before the Court is defendants' motion for summary

---

[7] Plaintiff also alleges that his rights under the First and Second Amendments were somehow violated as a result of the Hayward Police Department's formation of a tactical team to conduct surveillance at plaintiff's house and arrest Wayne Barsch. *See* Complaint at 9:7-16. The Complaint alleges "[w]hat law authorizes the police because of the mention of 'MULTIPLE GUNS' to form a swat team? Furthermore, who mentioned '<u>MULTIPLE GUNS</u>'? It certainly was not plaintiff or the person taken into custody. If the mere mention of 'MULTIPLE GUNS' is justification enough to call for a swat team formation then the First Amendment guaranteeing freedom of speech is meaningless. Nowhere in the Constitution of the United States or federal law is there any limit placed on the number of guns that a law abiding citizen may legally possess." *Id*. (emphasis in original).

Plaintiff's allegations do not state a claim for a violation of the either the First or Second Amendments. To the extent that plaintiff claims that the formation of a tactical team was unreasonable, such a claim is properly evaluated under the Fourth Amendment. Plaintiff does not dispute that the police had probable cause – based in large part on plaintiff's own sworn statement – to arrest Wayne, and also to believe that Wayne was potentially dangerous and that he had access to weapons at plaintiff's house. Under these circumstances, it was eminently reasonable for the police to assemble a tactical team. *Cf. United States v. Peterson*, 353 F.3d 1045, 1049-50 (9th Cir. 2003) (holding SWAT team's failure to "knock and announce" prior to execution of search warrant was reasonable because team reasonably believed that residence contained explosives and "[t]he Constitution does not require police officers to expose themselves to unnecessary and considerable personal risk and potential loss of evidence when carrying out a court-ordered search.").

5

judgment.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

**I.    Immunity**

    **A.    Defendants Orloff and Kubro are entitled to absolute prosecutorial immunity**

Plaintiff has sued Thomas J. Orloff, District Attorney for Alameda County, and Lance Kubro,

1 Assistant District Attorney for Alameda County.[8] The Complaint alleges that the District Attorney
2 prosecuted Wayne Barsch on the basis of a false police report. Complaint at 6:18-19. The Complaint
3 also alleges that "[p]laintiff's proofs of ownership consisting of the bills of sale for two rifles purchased
4 from the United States Army dating back to 1960 and 1964 were ignored," presumably by defendants
5 Orloff and Kubro. *Id*. at 6:24-26.

6 Prosecutors are absolutely immune from suit when engaged in activities that are "intimately
7 associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 431
8 (1976); *Sykes v. California*, 497 F.2d 197, 200 (9th Cir. 1974) (holding that as long as a district attorney
9 is acting within the performance of an integral part of his duties with respect to judicial process, he is
10 immune from civil liability for those acts). Defendants' prosecution of Wayne Barsch is such an
11 activity, and thus falls within the scope of prosecutorial immunity. *See Buckley v. Fitzsimmons*, 509
12 U.S. 259, 274 n.5 (1993); *Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005); *Milstein v. Cooley*,
13 257 F.3d 1004, 1008 n.3 (9th Cir. 2001).

### B. Defendants O'Toole, McAllister and Licata are entitled to qualified immunity

16 Plaintiff alleges that defendants O'Toole, McAllister and Licata did not conduct a fair and
17 impartial investigation of his complaint. Plaintiff alleges that these defendants never contacted him
18 regarding his complaint, and that "[b]y ignoring the plaintiff's side of the incident there is no way such
19 investigation can be fair or impartial." Complaint at 10:17-19; 8:1-9. The Complaint does state that as
20 part of the investigation, Officer Quinn interviewed plaintiff. *Id*. at 6:9-10.

21 Defendants O'Toole, McAllister and Licata contend that they are immune from suit. "When a
22 government official asserts a defense of qualified immunity, the court must first determine whether the
23 plaintiff has alleged facts which, if true, would constitute a deprivation of a constitutional right at all."
24 *B.C. v. Plumas Unified School Dist*., 192 F.3d 1260, 1265 (9th Cir. 1999) (*citing Wilson v. Layne*, 526
25 U.S. 603 (1999)). The Court finds that plaintiff's allegations are insufficient as a matter of law to
26 support the claimed constitutional violation. Even if it is true that defendants O'Toole, McAllister and

---

[8] Plaintiff initially did not serve the Complaint on these individuals. Based upon an executed summons dated August 22, 2007, it appears that these individuals were eventually served.

1 Licata did not personally contact plaintiff regarding his complaint, their failure to do so does not amount to a constitutional violation.  Plaintiff admits that he was interviewed regarding his complaint, just not by these particular defendants.  Plaintiff has not alleged that these defendants engaged in any specific wrongdoing with regard to the investigation of his complaint, nor has he submitted any evidence in support of his claim.  Accordingly, the Court finds that defendants O'Toole, McAllister and Licata are entitled to qualified immunity.

## II.     Fourth Amendment

Plaintiff alleges that police officers violated his Fourth Amendment rights when they entered his residence without a warrant and seized numerous weapons.  Defendants contend that they did not need a warrant to enter plaintiff's residence because they conducted a "protective sweep" of the interior of the residence.  Defendants have submitted the declaration of Hayward Police Department Officer Sheryl Mitchell.  Officer Mitchell arrested Wayne Barsch, and she states,

> Based on reports of multiple firearms/weapons at Edward's home, multiple death threats, the reasonable possibility that potential victim(s) to a violent crime were at the residence, the potential threats that any other person(s) in the home may pose to other person(s) including officers, among other things, HPD executed a protective sweep of Edward's home.  Just inside the front door of the home, HPD officers observed multiple firearms in plain view on the floor.

Mitchell Decl. ¶ 3(c).

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that police officers were not required to obtain a warrant to conduct a protective sweep, defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others." *Id*. at 327.  In *United States v. Paopao*, 469 F.3d 760 (9th Cir. 2006), the Ninth Circuit held that officers conducted a valid protective sweep of a gambling room after they arrested the defendant outside the gambling room.  "[A]n individual within a house can still pose a threat to arresting officers outside of it . . . . the location of the arrest, inside or outside the premises, should only bear on the question of whether the officers had a justifiable concern for their safety." *Id*. at 766.  The *Paopao* court held that the officers had a reasonable concern for their safety because they had received tips that two perpetrators of gambling room robberies were at the gambling room in question. *Id*.

8

Here, officers had a justifiable concern for their safety because, at the time they entered plaintiff's residence, they had the following information: (1) there were multiple firearms, ammunition and weapons inside the residence; (2) Wayne told police that he had stabbed a "pimp" the night before, but calls to local hotels had not confirmed the existence of any stabbing victims; (3) Wayne had bi-polar disorder, was not taking his medication, and had made numerous death threats against his sister; and (4) Wayne had told plaintiff that he wanted to kill somebody. Under the totality of the circumstances, it was reasonable for police officers to be concerned that there were potential victims in plaintiff's home and/or that there might be other people in the residence who posed a danger to police. *See United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc); *United States v. Lawlor*, 406 F.3d 37, 41 (1st Cir. 2005) ("[A]n arrest that occurs just outside the home can pose an equally serious threat to arresting officer as one that occurs in the home."); *United States v. Cavely*, 318 F.3d 987, 995-96 (10th Cir. 2003) ("Depending on the circumstances, the exigencies of a situation may make it reasonable for officers to enter a home without a warrant in order to conduct a protective sweep."); *cf. also United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) ("The emergency doctrine allows law enforcement officers to enter and secure premises without a warrant when they are responding to a perceived emergency.").[9]

## III. Fifth Amendment

Plaintiff alleges that his Fifth Amendment rights were violated because he has been "unlawfully deprived of his property that was illegally removed from plaintiff's residence." *Id*. at 11:13-14.[10] The Complaint also alleges that "Court order H40751 dated 5/22/06 caused plaintiff's property to be sold and the proceeds given to Wayne Barsch. This was done in spite of plaintiff's written objection that

---

[9] Plaintiff has not cited any authority in support of his claim that police officers violated the Fourth Amendment because they did not give him an inventory of the seized weapons. In any event, the Court notes that the criminal case file in *The People of the State of California v. Wayne Richard Barsch*, Alameda County Superior Court Case No. H-40751/Case No. 390723, identifies all of the weapons that were seized from plaintiff's house.

[10] The Fifth Amendment applies to actions by the federal government. The Court analyzes plaintiff's claim as if he had alleged a violation of his Fourteenth Amendment right not to be deprived of property without due process of law.

9

such action was illegal." *Id.* at 11:14-17.

Defendants contend that plaintiff's claims are barred by collateral estoppel. Defendants argue that in the criminal case against Wayne Barsch, the Superior Court already determined (1) that Wayne was the owner of the confiscated weapons, (2) that certain weapons should be sold and the proceeds paid to Wayne, (3) the value of those weapons, and (4) that assault weapons should be destroyed. "Collateral estoppel bars a party from relitigating an issue identical to one he has previously litigated to a determination on its merits in another action." *Ross v. Int'l Bhd. of Elec. Workers*, 634 F.2d 453, 457 n.6 (9th Cir. 1980). Under California law, "[t]he prerequisites for collateral estoppel are '(1) a final judgment on the merits in the first action, (2) identity or privity among the parties in the first action and those against whom the estoppel is asserted, and (3) identity of the issue presented in the second action with one necessarily decided in the first.'" *Ceresino v. Fire Ins. Exch.*, 215 Cal. App. 3d 814, 820 (1989) (*quoting Allstate Ins. Co. v. Overton*, 160 Cal. App. 3d 843, 847 (1984)).

The Court finds that plaintiff's claim is not barred by collateral estoppel. On the record before the Court, it is not clear to what extent, if any, the question of the ownership of the seized weapons was litigated in the criminal case. In addition, the Court is not persuaded that plaintiff is in privity with Wayne. The California Supreme Court has held that "[i]n the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." *Clemmer v. Hartford Ins. Co.*, 22 Cal. 3d 865, 875 (1978). Presumably plaintiff and his son had an identity of interest with regard to the value and disposition of the weapons, but they likely had a divergence of interest with regard to ownership.

Accordingly, the Court finds it necessary to reach the merits of plaintiff's due process claim. The Court directs the parties to provide supplemental briefs, with supporting declarations and evidence as is appropriate, regarding whether the procedures followed by defendants violated the Due Process Clause of the Fourteenth Amendment, including whether plaintiff had an opportunity to be heard regarding his claim that he owned some of the seized weapons. *See generally Zimmerman v. City of Oakland*, 255 F.3d 734 (9th Cir. 2001); *Conner v. City of Santa Ana*, 897 F.2d 1487 (9th Cir. 1990).

10

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS IN PART defendants' motion for summary judgment. (Docket No. 32). **The parties shall file the supplemental briefs as directed above no later than November 16, 2007.** The Court will then take the matter under submission.

**IT IS SO ORDERED.**

Dated: October 31, 2007

SUSAN ILLSTON
United States District Judge